# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-3655

REID L., *et al.*,

*Plaintiffs-Appellants*,

v.

ILLINOIS STATE BOARD OF EDUCATION, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 4180—**Robert W. Gettleman**, *Judge.*

———————

ARGUED MAY 13, 2003—DECIDED FEBRUARY 18, 2004

———————

Before ROVNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* This is the second time we have been asked to consider an effort to block the promulgation and implementation of new rules designed to bring the Illinois system of special education teacher certification into compliance with the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* This court's earlier opinion in this case, *Reid L. v. Illinois State Board of Education*, 289 F.3d 1009 (7th Cir. 2002) (*Reid I*), sets forth most of the facts relevant to the present appeal. For convenience, however, we review the key points here.

After extensive litigation between the Illinois State Board of Education (ISBE) and a group of special education teachers and students who live within the Chicago Public School district (known as the Corey H. parties), the district court entered a remedial decree against the ISBE. That decree was designed to bring the Illinois system of special education teacher certification into compliance with various requirements of the IDEA, particularly its directive that students be educated in the least restrictive environment, 20 U.S.C. § 1412(a)(5). *Corey H. v. Bd. of Educ. of the City of Chicago*, 995 F. Supp. 900 (N.D. Ill. 1998). Unhappy with the new certification rules being developed for the state of Illinois, a group of special education teachers and students who live outside the Chicago Public School district (known collectively as the Reid L. parties) tried unsuccessfully to intervene directly in the *Corey H.* litigation and block implementation of the new certification rules. In *Reid I*, we affirmed the district court's order denying the Reid L. plaintiffs' motions to intervene, and we affirmed the district court's denial of a preliminary injunction to stop the new rules from going into effect. In this successive appeal, we affirm the district court's dismissal of the Reid L. plaintiffs' claims for lack of standing.

# I

Under the ISBE rules that were in effect before this litigation, special education teachers were trained and certified in eight disability categories: learning disabilities, social/emotional disorders, educable mentally handicapped, trainable mentally handicapped, physically handicapped, blind/visually impaired, deaf/hard of hearing, and speech/language handicapped. The district court found that because teachers were trained and certified to teach by category of disability, they were unable to service disabled children in integrated settings, in violation of the least

restrictive environment mandate of the IDEA, 20 U.S.C. § 1412(a)(5). *Corey H.*, 995 F. Supp. at 909-12. Antiquated certification categories, combined with inadequate training and teacher education in Illinois (geared to the certification categories) impermissibly supported the categorical segregation of children with disabilities. *Id.*

The ISBE chose not to pursue the lawsuit after the *Corey H.* decision. Instead, it entered into a settlement agreement with the Corey H. parties, which the district court approved on June 18, 1999, following extensive notice and a public hearing. Under the settlement agreement, the ISBE was to have the primary responsibility of developing special education teacher certification rules, in cooperation with the Chicago Board of Education and the Corey H. parties. Any such rules, however, remained subject to the court's jurisdiction to ensure that the plan eventually adopted was consistent with the permanent injunction the court had already entered against the ISBE forbidding further violations of the IDEA. *Corey H.*, 995 F. Supp. at 918.

The ISBE then set out to work with Illinois parents, advocates for students with disabilities, and educators, to revamp the teacher certification rules. It created advisory panels, which conducted public statewide hearings and consulted with numerous outsiders, including teachers, universities, and professional associations. This process elicited a wide range of views—so wide that the ISBE realized that it was not likely to find a consensus solution. In coming up with its final proposal, the ISBE took a number of factors into account, including the following: the number of students with disabilities in more than one category; the need to train teachers for a new system; the possible effect of a new system on the supply of special education teachers; the effect of a new system on the ability of local school districts to deliver services to disabled students; the length of time needed to implement any new system; and the likely effect of a new system on existing

teachers. With all this in mind, the ISBE staff developed a proposal that contemplated one certificate (Learning Behavior Specialist 1, or LBS1) for five of the former categorical certificates (learning disability, social/emotional disorder, educable mentally handicapped, trainable mentally handicapped, and physically handicapped), and separate certificates for specialists teaching students who have vision impairments, hearing impairments, or early childhood or speech language disorder. This was the proposal the district court approved.

The court also appointed a monitor to assist it in overseeing both the Chicago Board's and the ISBE's compliance with their respective settlement agreements. In keeping with the monitor's recommendation, on September 12, 2000, the district court ordered the ISBE to file its proposed certification rules as peremptory rules with the Joint Committee on Administrative Rules (JCAR) in the Illinois General Assembly, following the normal procedures established by the Illinois Administrative Procedure Act (IAPA). See 5 ILCS 100/5-50 (describing peremptory rulemaking). It concluded that this was proper because these rules were "required as a result of federal law, federal rules and regulations, [or] an order of a court," 5 ILCS 100/5-50, not as a "consent order[ ] or other court order[ ] adopting settlements negotiated by the agency," *id.* As noted earlier, the fact that the ISBE developed the rules at all was a result of the district court's decision on liability, and thus was because of "an order of a court."

On October 26, 2000, the ISBE published the certification rules under its peremptory rulemaking authority. At that point, a tug-of-war at the state level emerged. In January 2001, JCAR suspended the rules, claiming that they constituted a serious threat to the public interest and welfare. The district court judge then met with the Corey H. parties and certain members of the Illinois General Assembly to decide what to do, but these efforts at

consensus also failed. On February 21, 2001, JCAR again announced that the rules were suspended. On February 27, 2001, exercising the power to act independently of the ISBE that it had reserved in both the ruling on liability and in the settlement agreement, the court ordered the ISBE to implement the rules immediately without referral to JCAR. The Illinois General Assembly attempted to stop the implementation of the rules, voting to continue indefinitely the suspension of the rules and passing a joint resolution of both houses on May 31, 2001.

At the same time, the court ordered the ISBE to conduct public hearings on another set of rules, the Rules for Transition to the New Special Education Certification Structure (transition rules). The transition rules outlined the procedure by which teachers holding certificates under the old system would become requalified as holders of the LBS1 certificate. Essentially, they created a three-year grace period for such teachers, giving them time to acquire any additional training they might need. During that interim period, the Illinois school district could assign a transitional teacher to teach students outside his or her prior categorical certificate, with procedural safeguards in place to ensure that students continued to receive a free appropriate education. See 20 U.S.C. § 1415; see also *Corey H.*, 995 F. Supp. at 906-07 (describing procedural safeguards under the IDEA). On June 28, 2001, the court ordered the ISBE to implement the transition rules.

At around this time, the Reid L. parties had filed an action for declaratory and injunctive relief, contending that both the new certification rules and the transition rules were unlawful under the IDEA and IAPA. The district court denied the Reid L. parties' request for preliminary injunctive relief, and we affirmed. In *Reid I*, we expressed our doubt that the Reid L. parties had standing and agreed with the district court that the likelihood of success on the merits of their claims was slim. The ISBE subsequently

moved in the district court to dismiss the Reid L. parties' complaint, which the district court had stayed pending our decision in *Reid I.* On September 10, 2002, the district court granted the defendants' motions to dismiss, finding that the Reid L. parties lacked standing to pursue their claims, and that their complaint failed to state a claim upon which relief could be granted. This appeal followed.

## II

We review motions to dismiss for lack of standing *de novo. Help at Home, Inc. v. Med. Capital, L.L.C.*, 260 F.3d 748, 752 (7th Cir. 2001). In ruling on a motion to dismiss for lack of standing, the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor, unless standing is challenged as a factual matter. *Retired Chicago Police Assoc. v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996). In the latter situation, the district court may find the facts, and our review is for clear error. The plaintiffs, as the parties invoking federal jurisdiction, bear the burden of establishing the required elements of standing. *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003). "Those elements are (i) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical; (ii) a causal relation between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant; and (iii) a likelihood that the injury will be redressed by a favorable decision." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

In this case, there are two groups of plaintiffs: students and teachers. The student-plaintiffs claim that the new certification rules violate their right to a "free appropriate education," 20 U.S.C. § 1412(a)(1). The teacher-plaintiffs

claim that the new certification rules were adopted in violation of Illinois's rulemaking procedures under the IAPA, 5 ILCS 100 *et seq.* We consider each set of plaintiffs in turn.

The student-plaintiffs argue that they are injured because, under the new certification rules, students with disabilities will be taught by less qualified teachers and will thus be denied their right to a "free appropriate public education." 20 U.S.C. § 1412(a)(1). This harm will occur in two different ways, in their view. First, during the transition period, because teachers may be assigned to students with disabilities outside their prior certification, these students may be taught by teachers not yet trained to meet their needs. Second, under the permanent certification standards, teachers on whole will be less qualified, because they will be required to demonstrate knowledge of many disability areas and therefore will be unable to meet students' specific needs.

All of these claims, however, are entirely speculative, and as such, they do not demonstrate an injury in fact. *Lujan*, 504 U.S. at 561. With respect to the claims based on the permanent rules, they are based largely on disagreement over pedagogical theory. *Reid I*, 289 F.3d at 1019. There is no reason to assume that the student-plaintiffs as a group would not receive an "appropriate" education under a less categorical certification system, particularly where a less categorical certification system has been found by the district court to be necessary to comply with IDEA's directive that students be taught in the least restrictive environment. *Reid I*, 289 F.3d at 1013-14.

More importantly, the IDEA is not concerned with group rights; it is concerned with the education of each individual student. Even if, under the new rules and transition rules, a particular student with disabilities was misplaced with teachers not qualified to meet her needs, procedural safeguards under the IDEA remain in place to correct the

error. (Indeed, some misplacements occur under any system; it is not as if parents never challenged educational plans or teacher assignments under the prior system.) These procedural safeguards include:

> an opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.

20 U.S.C. § 1415(b)(1). It is through these procedural safeguards that the IDEA provides for the enforcement of a "free appropriate public education" to individual children with disabilities. For this reason, the student-plaintiffs have not identified an injury in fact from either the transitional or new rules that is "actual or imminent" and their claims were properly dismissed for lack of standing.

Even if the teacher-plaintiffs can show a concrete injury that is legally cognizable (a point on which we do not rule), they cannot survive the causation or redressability requirements of standing. The teacher-plaintiffs' injury stems from *how* the new certification rules were implemented—that they were implemented in violation of the IAPA state legislative procedures. But it was the district court, not the ISBE, that was responsible for the ultimate decision to implement the new rules without regard to state procedures. As we noted earlier, the district court compelled the ISBE to develop the new rules. It tried using the ISBE's peremptory rulemaking authority under the IAPA, but in the end after JCAR suspended the rules, the district court ordered the ISBE to implement the rules notwithstanding JCAR's opposition. *Reid I,* 289 F.3d at 1021 (stating that it was the federal court that "stepped in and mooted any point about compliance with state administrative procedures.

Rather than using these procedures, the court simply ordered on February 27, 2001, that the rules were to go into effect."). For these reasons, the teacher-plaintiffs' injury is not traceable to "the defendant's allegedly unlawful conduct" and is not "likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). Therefore, the teacher-plaintiffs also lack standing.

### III

Because the student-plaintiffs have failed to demonstrate an injury-in-fact, and the teacher-plaintiffs have failed to demonstrated causation or redressability, this action was properly dismissed for lack of standing. We therefore express no opinion on the question whether the Reid L. plaintiffs' complaint fails to state a claim upon which relief may be granted.

The judgment of the district court is AFFIRMED.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*